IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 5, 2017 Session

## STATE OF TENNESSEE v. OCTAVIUS FLYNN and DERRICK BENSON

**Appeal from the Criminal Court for Shelby County**
No. 12-06552        Paula L. Skahan, Judge

_____

## No. W2015-01648-CCA-R3-CD

_____

The Defendants, Octavius Flynn and Derrick Benson, appeal their convictions for second degree murder and their respective sentences of twenty-five and twenty-four years. On appeal, the Defendants argue, either individually or collectively, that (1) the trial court erred in denying their motions to sever; (2) a witness's identification of Mr. Flynn in a photographic array was unreliable and should have been suppressed; (3) the evidence was insufficient to support the convictions; (4) the trial court erred in denying Mr. Flynn's motion to dismiss due to spoliation of evidence; (5) the jury failed to follow the trial court's instructions and improperly compromised on a verdict of second degree murder; and (6) the sentences are excessive. Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Howard B. Manis, Memphis, Tennessee, for the appellant, Octavius Flynn.

Eric Mogy (on appeal) and Neil Umsted (at trial) Memphis, Tennessee, for the appellant, Derrick Benson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Colin Campbell and Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented at trial established that on August 27, 2012, the Defendants shot and killed nineteen-year-old Mr. Derrion Johnson at the Hillview Apartments in Memphis, Tennessee. The victim was standing outside the apartment complex with friends when the Defendants approached them from a "cut" or a walkway between two apartment buildings. The Defendants opened fire, shooting the victim multiple times. During the shooting, Mr. Benson sustained a gunshot wound to his ankle. The Defendants fled the scene, and Mr. Flynn drove Mr. Benson to a nearby hospital to receive treatment for his gunshot wound. Mr. Benson later gave a statement to the police, admitting that he was present when the shooting occurred.

### The State's Proof

At trial, the State presented the testimony of multiple witnesses who were in the area at the time of the shooting. Mr. Aaron Turner testified that on August 27, 2012, at around 10:00 or 10:30 p.m., he was walking around outside the apartment complex with Sireric Payne when he saw two men walk through a "cut" and up to a group of people, including the victim. One of the men approached the group from the right, and the other man approached them from the left. Both men fired their handguns at the victim. Mr. Turner said he did not hear either shooter say anything to the group when they first approached. Mr. Turner did not know either of the shooters and said that one shooter was approximately six feet, one inch tall and that the other shooter was approximately six feet tall.

Mr. Turner fled once the shooting began. After the shooting ceased, he saw the shooters flee toward the front of the apartment complex. He stated that as the shooters were leaving, he heard one shooter tell the other shooter, "[C]uz, you just shot me or something like that."

Mr. Turner testified that once the victim's brother learned of the shooting, he came outside and saw the victim lying on the ground. The victim's brother then began shooting an assault rifle into the air out of anger. After the shooting, Mr. Turner did not remain at the scene to speak to police officers. He explained that he had known the victim since high school, that he thought the shooting was a "tragedy," and that he did not wish to remain at the scene as a result.

On cross-examination, Mr. Turner testified that earlier that evening, he, the victim, and several others played basketball at a court located across the street from the apartment complex. Mr. Turner then went to the apartment complex at 7:00 or 8:00 p.m. where he and others stood around and talked. He did not recall the exact time that the

shooting occurred, but stated that he remained at the apartment complex for three or four hours prior to the shooting.

Mr. Turner testified that when the victim was shot, he was standing with Mr. Payne and Mr. Antonio McKinley approximately ten to fifteen feet away from the victim. The victim was in a group of four or five other people. The shooters walked past Mr. Turner and toward the group where the victim was standing. At that time, the shooters were not displaying guns, and Mr. Turner did not notice anything peculiar about them. Mr. Turner said that at one point, one shooter was standing in front of the group while the other shooter was standing behind the group. Mr. Turner did not recall where the shooters were standing when they began shooting. He said that as the shooters were fleeing, one shooter was limping. He also said that one shooter was wearing a white t-shirt and light brown pants and that the other shooter was wearing a white t-shirt and black jeans. Mr. Turner estimated that the victim's brother shot the assault rifle approximately fifteen to twenty minutes after the victim was shot.

Mr. Turner gave a statement to the police the following day. He viewed multiple photographic arrays but was unable to identify either of the shooters. He identified "Little Cord" in one array and explained that "Little Cord" came to the apartment complex on occasions to roll dice. A few days prior to the shooting, the victim and "Little Cord" were involved in an altercation. Mr. Turner did not see the altercation but said "Little Cord" told him that the victim and the victim's brother "jumped" him. Mr. Turner did not see "Little Cord" at the apartment complex on the night of the shooting. He stated that others said "Little Cord" was the reason that the victim was killed.

Mr. Rhakeem Fields, who was in custody at the time of trial, testified that on August 27, 2012, he was living at the Hillview Apartments and saw the victim get shot three or four times at around 10:00 or 10:30 p.m. as Mr. Fields was standing outside on his patio located on the second floor. Mr. Fields saw two people standing with the victim and then saw one person walk up from the side and shoot the victim in the head and body. Mr. Fields described the shooter as between five feet, six inches and five feet, seven inches tall with a "[l]ow haircut" and wearing a white and navy striped polo shirt, a "polo" hat, and navy pants. Because it was dark outside and Mr. Fields was more than fifty feet away when the shooting occurred, he was unable to identify the shooter.

Once the shooting began, Mr. Fields and the others who were on his patio ran inside his apartment. While inside the apartment, Mr. Fields heard additional gunshots but did not know whether the gunshots came from the same shooter. Once the shooting stopped, Mr. Fields ran outside to the victim, who was lying on the ground and "twitching." Mr. Fields had not realized the victim's identity when he witnessed the

shooting from the patio in the dark, but when he ran up to the victim, he recognized him. Mr. Fields then ran to tell the victim's brother.

On cross-examination, Mr. Fields testified that he only saw one shooter, whom he described as "heavyset." He did not know the two people who were with the victim prior to the shooting but said they were likely the victim's friends. Mr. Fields saw the shooter approach the group but did not hear any conversation or argument prior to the shooting. He said he would not have heard a conversation from the distance where he was standing. He stated that the victim was facing the shooter when the shooter approached but that the shots must have come from the side because the victim was shot in his back and the side of his head. Mr. Fields also stated that the shooter's gun appeared to be silver.

Mr. Fields acknowledged that he told police officers following the shooting that he saw six or seven people standing in a circle and that one of the people in the circle produced a gun and began shooting. Mr. Fields affirmed that this was his recollection of the events that evening and stated that the shooter did not walk up to the victim and immediately begin shooting. Mr. Fields ran inside his apartment after hearing three or four gunshots. He did not know how long he was inside of his apartment when he heard the additional gunshots. He never saw the victim's brother with a firearm or anyone else with an assault rifle.

On redirect examination, Mr. Fields testified that the shooter's shirt had navy and white horizontal stripes. He later clarified that the shirt had dark stripes.

Mr. Marcus Taylor, who grew up with the victim, testified that on August 27, 2012, at around 4:00 or 5:00 p.m., he, the victim, and several others played basketball at a basketball court across the street from the Hillview Apartments for one and one-half to two hours. Mr. Taylor went home to shower, watched television, and then returned to the Hillview Apartments. At approximately 9:00 or 10:00 p.m., Mr. Taylor, the victim, Mr. Antonious McKinley, Mr. Tevaius Chambers, Mr. Rodney Thompson, and Mr. Octavius Thompson were standing and talking outside the complex by a dumpster. Mr. Taylor said that a light pole was by the dumpster and that while there was not enough light to see across the apartment complex, the light was sufficient such that he could recognize someone who approached him.

Mr. Taylor saw two men, neither of whom he recognized, approach from about fifteen to twenty feet away. He said that one man was wearing a black shirt with white stripes and that the other man was wearing all black. Upon approaching, the men separated, and when Mr. Taylor turned to speak to Mr. Chambers, the men began shooting their handguns. Mr. Taylor never saw the shooters' guns. He heard five shots and stated that both men were shooting. Mr. Taylor also stated that he did not hear either

of the shooters say anything when they approached and that the shooters began shooting three to five seconds after approaching.

Once the shooting began, Mr. Taylor ran to the nearest "cut" and did not see which direction that the shooters went following the shooting. He said he did not hear the shooters say anything as they were leaving. He acknowledged that the following morning, he told police officers that he heard one of the shooters say, "bruh, you shot me." At trial, Mr. Taylor clarified that someone else in the group told him that one of the shooters made the statement.

Following the shooting, Mr. Taylor returned to find the victim lying on the ground. The victim attempted to speak but was unable to do so due to the amount of blood in his mouth. Mr. Taylor remained at the scene and waited for an ambulance to arrive. Police officers later showed Mr. Taylor several photographic arrays. Mr. Taylor identified "Little Cord" and someone with whom he had attended school in the photographic arrays.

On cross-examination, Mr. Taylor testified that he did not look at the shooters long enough to see their faces. Prior to the shooting, Mr. Turner, Mr. Payne, and Mr. McKinley walked away from the group and were talking nearby when the shooting occurred. Mr. Taylor said the shooters came from an area closer to where Mr. Turner, Mr. Payne, and Mr. McKinley were standing. Mr. Taylor did not hear any more gunfire after he fled. He did not see the victim's brother with a gun and did not see anyone else with an assault rifle.

Mr. Taylor recalled that the victim and "Little Cord" were involved in an altercation a few days prior to the shooting. Mr. Taylor did not see the altercation but said that the victim told him about it. Mr. Taylor saw "Little Cord" at the Hillview Apartments on four or five occasions but had not seen the shooters prior to the night of the shooting.

Mr. Rodney Thompson[1] testified that on August 27, 2012, he, the victim, and several others played basketball at a basketball court across the street from the Hillview Apartments. They stopped playing around 7:30 p.m. as it was beginning to become dark and returned to the Hillview Apartments where they remained outside for one or two hours. Mr. Rodney Thompson said he, the victim, Mr. Taylor, Mr. McKinley, and Mr. Chambers were standing in a group and talking when he saw two men walk through a "cut" and approach the group from ten to thirty feet away. Mr. Rodney Thompson had

---

[1] Because multiple witnesses share the same last name, we refer to these witnesses by their full names.

- 5 -

never seen the two men before and was not paying attention to them. The two men split up with one man in front of the group and one behind them and began shooting. He did not hear the men say anything before the shooting began and heard five or six shots.

Once the shooting began, Mr. Rodney Thompson ran approximately thirty feet. Once he no longer heard gunshots, he returned to check on the victim. He estimated that approximately seven minutes passed between him fleeing and returning to the victim. He did not see where the shooters fled.

On August 30, 2012, Mr. Rodney Thompson went to the homicide office where he gave a statement to police officers and viewed multiple photographic arrays. He identified Mr. Benson in a photographic array and at trial as the shooter who was shooting behind the group. He also identified "Little Cord" in one photographic array and said that neither of the shooters was "Little Cord."

On cross-examination, Mr. Rodney Thompson testified that five to seven people were standing with the victim when he was shot. He said they were standing shoulder to shoulder with the victim standing somewhat in front of the group and "clockwise" to Mr. Rodney Thompson. He also said that he had never seen the shooters before and that the shooting occurred very fast. As one of the shooters walked behind the victim, Mr. Rodney Thompson "glanced" at the shooter and saw his face. The area was not completely dark; rather, a light pole was in the area. He did not see the victim's brother at the scene and did not see anyone with an assault rifle or any other weapon.

Mr. Rodney Thompson testified that he had not seen "Little Cord" in the area gambling. He heard that the victim and "Little Cord" were involved in an altercation but did not witness it.

Mr. Rodney Thompson did not recall the number of photographic arrays that he viewed but said he identified someone in two photographic arrays. He also did not recall previously testifying in another hearing that he "probably" saw the person whom he identified in the photographic array at the crime scene. He stated that the shooter whom he saw shooting was wearing black pants.

Mr. Tevaius Chambers testified that on the day of the shooting, he, the victim, and others returned to the apartment complex after playing basketball and stood outside talking for forty-five minutes to one hour. He also said that during that time, it was getting close to dark and that while the area is not very well lit after dark, people had their lights on enabling him to see. Mr. Chambers stated that as they were talking, he saw two men walk out of a "cut" and by the group. He saw the men from three or four feet away and described them as African American, in their twenties, and wearing dark

- 6 -

clothing. The men returned to the group approximately thirty or forty-five seconds later and began shooting, firing multiple shots. Mr. Chambers had never seen the shooters before that day. Once the shooting began, Mr. Chambers ran to a friend's apartment located on the east side of the apartment complex. He returned to the scene when the police arrived approximately five minutes later.

Mr. Chambers spoke to the police about the shooting several months later in November 2012. He viewed multiple photographic arrays and identified both of the Defendants in the arrays as the shooters. He also identified the Defendants as the shooters at trial.

Mr. Chambers said he saw the victim and "Little Cord" argue over a dice game a few days prior to the shooting. He did not witness the argument become physical.

On cross-examination, Mr. Chambers acknowledged that he had two prior convictions for theft of property valued less than $500.00. He denied that he avoided giving a statement to the police and said he did not know that he should have spoken to the police officers at the scene. He acknowledged that while police officers asked him to give a statement when he viewed the photographic arrays in November 2012, he did not give a statement until March 2013 while in police custody. He also acknowledged that a subpoena was issued for him to testify during a proceeding related to the case, that he failed to appear at the hearing, and that the trial court issued a warrant as a result.

Mr. Chambers testified that Mr. Taylor, Mr. Rodney Thompson, Mr. Octavius Thompson, Mr. Turner, Mr. Antonious McKinley, Mr. Roy McKinley, Mr. Payne, and Mr. Marcus Clark were also present at the time of the shooting. Mr. Chambers said the victim was standing next to him at the time of the shooting. He first estimated that the shooters were three or four feet away from the victim and then stated that he did not know exactly how far away the shooters were.

Mr. Chambers did not see the victim's brother or anyone else with an assault rifle at the scene. He acknowledged that he and his friends had discussed what occurred on the night of the shooting and who may have killed the victim. He believed that the victim and "Little Cord" were involved in a physical altercation following their argument, but he did not witness the altercation.

Mr. Antonious McKinley testified that he had previously pled guilty to aggravated robbery. On August 27, 2012, after playing basketball that afternoon, he, the victim, and several others returned to the Hillview Apartments where they gambled and shot dice. They then began walking around the apartment complex around 7:00 or 8:00 p.m. when it was dark outside. Mr. McKinley stated that he, the victim, Mr. Rodney Thompson, Mr.

Octavius Thompson, Mr. Chambers, and Mr. Taylor were standing around talking when Mr. McKinley saw two men walk through the "cut." Mr. McKinley said that one man was wearing a black and white horizontal striped shirt and black pants and that the other man was wearing a white t-shirt and black pants. The men approached the group and began shooting. Mr. McKinley stated that both men were holding similar chrome and black handguns that were either nine millimeter or forty caliber guns.

Mr. McKinley ran away once the shooting began. Following the shooting, he heard the shooter who was wearing a white t-shirt and black pants say, "Damn bro, you shot me." Mr. McKinley returned to the scene where the victim was lying on the ground. He estimated that approximately fifty to one hundred people were in the area following the shooting and before the police arrived. He later spoke to the police and viewed several photographic arrays. He identified "Little Cord" in a photographic array as someone with whom he gambled, but he testified that he did not see "Little Cord" at the apartment complex when the shooting occurred. Mr. McKinley was unable to identify any of the shooters.

On cross-examination, Mr. McKinley testified that the shooters did not speak when they first walked up to the group and before they began shooting. He said the shooter who was wearing a white t-shirt was also wearing a black do-rag. Once the shooting began, Mr. McKinley ran and ducked behind a group of cars. While hiding behind a car, he saw the shooters flee and heard one of the shooters yelling, "[Y]ou shot me." Mr. McKinley said the shooter was shot in his right leg.

Mr. McKinley did not see the victim's brother at the scene and did not see anyone with an assault rifle. He did not hear any other gunshots after the shooters stopped shooting. He did not recall whether Mr. Turner was present at the time of the shooting. Mr. McKinley said Mr. Robert McKinley, Mr. Payne, and Mr. Marcus Clark were not present at the time of the shooting but arrived at the scene after the shooting occurred. Mr. McKinley stated that he was told of a prior altercation between the victim and "Little Cord."

Mr. Dedrick Flynn, Mr. Flynn's brother, testified that he commonly allowed others to use his cellular phone. He knew Mr. Benson as his brother's friend.

Ms. Angelite Dade testified that she was employed with Neustar, an authorized agent for Cricket Communications that maintained and produced cellular phone records in response to legal processes that had been served on Cricket Communications. She produced the cellular phone records for numbers assigned to Mr. Dedrick Flynn and Ms. Nina Benson. On August 27, 2012, the number assigned to Mr. Dedrick Flynn called the number assigned to Ms. Benson on two occasions at 4:42 p.m. Ms. Benson's number

called Mr. Dedrick Flynn's number later that evening at 7:04 p.m. From 10:59 p.m. to 2:11 a.m., Ms. Benson's number received incoming calls that were not answered.

Mr. Sean Lovejoy with the 911 Center of the Memphis Police Department testified that the 911 Center received the first call from the scene on August 27, 2012, at 10:40 p.m. At 10:53 p.m., the 911 Center received a call from Methodist South Hospital reporting that a shooting victim came to the hospital.

On cross-examination, Mr. Lovejoy testified that at 10:42 p.m., someone called and reported that shots were still being fired. Another caller described the shooters as two African American males with dreadlocks who were not wearing shirts. An officer also called and reported that he saw someone running from the scene.

On redirect examination, Mr. Lovejoy testified that at 10:52 p.m., the radio dispatcher reported that the officer stated that the shooter was an African American male who was approximately five feet, six inches tall, had a short haircut, was wearing a blue and white striped polo shirt and blue pants, and was last seen running westbound down Alcy near the apartment complex. Mr. Lovejoy was unable to determine whether the officer's description was based upon his own observations or those reported by a witness.

Officer Lee Walker with the Crime Scene Investigation Unit of the Memphis Police Department collected six 7.62 casings, one live 7.62 bullet, two nine millimeter casings, and one forty caliber casing from the scene. Officer Walker said that a 7.62 bullet is generally shot with an assault rifle and that nine millimeter and forty caliber bullets are generally shot with handguns.

On cross-examination, Officer Walker testified that a nine millimeter bullet could be fired from a handgun or a "tech-9," a semiautomatic weapon that is larger than a handgun. He did not know whether a 7.62 bullet could be fired from a firearm other than an assault rifle.

Officer Walker stated that the only blood found at the scene was where the victim was lying. He did not see any trails of blood coming from or toward the victim's body. He stated that while there was some lighting at the scene, it "wasn't the greatest." He stated on redirect examination that he was able to see that night at the crime scene.

Sergeant James Taylor with the Felony Response Unit of the Memphis Police Department testified that on the night of August 27, 2012, or early morning hours of August 28, 2012, his supervisor assigned him to go to Methodist South Hospital where a person was receiving treatment for a gunshot wound to the leg. After arriving at the hospital, Sergeant Taylor came into contact with Mr. Benson.

Retired Sergeant John Oliver, who was assigned to the Homicide Bureau of the Memphis Police Department in August 2012, interviewed Mr. Aaron Turner at the homicide office two or three days following the shooting. Sergeant Oliver said Mr. Turner was very cooperative and gave a statement. Mr. Turner stated that when the shooters approached the group, one of the shooters asked which of them was "DJ" and that the victim said, "[I]t's me. Wassup?"

Sergeant Oliver testified that officers learned from a witness that one of the shooters had been shot during the incident. He had a dispatcher run a log of every call received during the time frame of the shooting to determine whether anyone came to a hospital with a gunshot wound. Sergeant Oliver learned that Mr. Benson sought treatment from Methodist South Hospital for a gunshot wound during the timeframe of the shooting. Sergeant Oliver reviewed the hospital's video surveillance taken during the time in which Mr. Benson reported to the hospital. The video showed Mr. Flynn, who was wearing a striped shirt, helping Mr. Benson out of the backseat of a car parked in the bay area of the hospital. Hospital personnel then came out to assist Mr. Benson. At some point after Mr. Benson was taken out of the car, Mr. Flynn retrieved an item out of the trunk and then walked around the car and into the parking lot. Mr. Flynn later entered the hospital lobby wearing a different shirt.

Sergeant Oliver testified that Methodist South Hospital was located approximately five or six miles away from Hillview Apartments. One afternoon, he drove two routes from the apartment complex to the hospital in moderate traffic. He arrived at the hospital in nine minutes and forty seconds taking one route and ten minutes and fifty-three seconds taking the second route.

On cross-examination, Sergeant Oliver testified that he was present when Mr. Benson was interviewed by police officers. Mr. Benson was picked up at his home at 7:30 p.m. on August 30, 2012, and arrived at the homicide office at 7:50 p.m. Sergeant Oliver acknowledged that Mr. Benson had a gunshot wound to his leg and said he checked on Mr. Benson regularly while Mr. Benson was waiting to be interviewed. Officers entered the interview room to question Mr. Benson at 9:30 p.m. Sergeant Oliver recalled that Sergeant Robert Wilkie asked Mr. Benson about the prescription drugs and the amounts that he had taken. Sergeant Oliver recorded in his report that Mr. Benson last took prescription drugs at 6:30 p.m. and that he was not under the influence of drugs or alcohol. Sergeant Oliver acknowledged that no record was created regarding what prescription drugs that Mr. Benson had taken or the amounts.

Sergeant Oliver received a tip that "Little Cord" and the victim were involved in a fight one or two days before the shooting. The victim's mother also informed police officers of the fight. Sergeant Oliver did not interview "Little Cord." He explained that

while several individuals identified "Little Cord" in a photographic array, none of the witnesses said they saw "Little Cord" at the scene on the night of the shooting or said that he was involved in any way.

Sergeant Oliver stated that Mr. Turner did not identify either of the Defendants in photographic arrays and that Mr. Thompson was unable to identify Mr. Flynn in a photographic array. While Sergeant Oliver obtained information that someone other than the victim may have been shot at the scene, he did not locate any blood evidence of another shooting at the scene.

Lieutenant Anthony Mullins of the Memphis Police Department was assigned to the Homicide Bureau in August 2012 and took Mr. Marcus Taylor's statement on August 28, 2012. Lieutenant Mullins said Mr. Taylor was at the police department voluntarily and did not have any problems speaking to the officers. When Lieutenant Mullins asked Mr. Taylor whether he heard either shooter say anything, Mr. Taylor said he heard one of the shooters say, "[B]ruh, you shot me." Lieutenant Mullins said that if Mr. Taylor had stated that he overheard someone state that he or she heard one of the shooters make this statement, Lieutenant Mullins would have questioned Mr. Taylor further to determine from whom he learned of the statement.

On cross-examination, Lieutenant Mullins testified that Mr. Taylor identified "Little Cord" in a photographic array but was unable to identify either of the Defendants in two other photographic arrays. Lieutenant Mullins did not believe that Mr. McKinley was able to identify either of the Defendants in photographic arrays.

Sergeant Robert Wilkie, who was assigned to the Homicide Bureau of the Memphis Police Department, interviewed Mr. Benson and took his statement a few days after the shooting on August 30, 2012. Sergeant Wilkie advised Mr. Benson of his rights at 9:40 p.m. Sergeant Wilkie stated that while Mr. Benson was taking prescription drugs as a result of a gunshot wound sustained earlier in the week, he was coherent and did not have any trouble understanding the questions or conversing with Sergeant Wilkie. Mr. Benson waived his rights and agreed to speak to Sergeant Wilkie. Mr. Benson was questioned for approximately two and one-half hours.

Sergeant Wilkie testified that Mr. Benson denied responsibility for killing the victim but admitted that he was present when the victim was shot. Mr. Benson said that he was at the apartment complex by himself, that he was shot with a handgun, and that "[a]ll [he] saw w[ere] handguns." Mr. Benson denied knowing anyone who was with the shooter at the time of the shooting and said that while the victim was around others when he was shot, Mr. Benson did not know whether the people were friends of the victim.

- 11 -

Mr. Benson stated that he had a brown .22 caliber gun, which "[t]hey" took following the shooting. He denied firing any shots. He did not know what time the shooting occurred. He said that while it was dark outside, the streetlights in the apartment complex were lit.

Mr. Benson told Sergeant Wilkie that the victim was shot due to an altercation during a dice game at Studio Blue, a night club, on the Saturday prior to the shooting. Mr. Benson stated that the victim had been cheating during the dice game. When asked to explain what occurred during the shooting, Mr. Benson stated:

> I was going to get dropped off at Hillview to see if dude was over there. The plan was so that they could fight him because of the dice game. We decided to carry guns for protection in case it got out of hand. This was earlier on Monday; it was just starting to get dark. So it got dark and I was dropped off. I walked through the apartments and sat on the stairs. About thirty minutes I saw the dude wearing, a black shirt and some khaki pants. I called and said that I saw the dude. And then when they came, so when they were walking up, I was getting up from the steps to get close and that's when I saw them pull the guns out and they just started shooting and then a bullet hit me in the leg. I was yelling, "you shot me bra, you shot me." I started running but I couldn't run while my gun was in my sock, so I took it out to run better. We pulled off and I saw two dudes just keep running.

Mr. Benson said the "fat dude that was driving the car" was the closest to the victim when the shooting occurred. Mr. Benson also said he knew what the victim was wearing that night because he was told.

On cross-examination, Sergeant Wilkie testified that Mr. Benson was picked up at his home around 7:30 p.m. and brought to the homicide office. He was placed inside of a room and left there for approximately two hours. Sergeant Wilkie acknowledged that Mr. Benson had a gunshot wound to his leg at that time. Sergeant Wilkie believed that Mr. Benson was given a chair and was periodically checked on to see if he needed anything. Sergeant Wilkie acknowledged that Mr. Benson possibly had his head down when Sergeant Wilkie walked into the room to begin the interview. While the advice of rights form noted that Mr. Benson had taken prescription drugs at 6:30 p.m., there was no notation regarding what prescription drugs or the amounts that he had taken.

Sergeant Wilkie stated that after he advised Mr. Benson of his rights, Sergeant Wilkie began "asking about the inconsistencies between the story that [Mr. Benson] gave about getting shot and his involvement in this homicide." During two hours of questioning, Mr. Benson consistently denied involvement in the victim's death. Sergeant

Wilkie told Mr. Benson that only the truth could help him. Sergeant Wilkie acknowledged that he lied to Mr. Benson and that the truth would not have helped Mr. Benson in his case. Sergeant Wilkie said that Mr. Benson already had been told that he had been identified as one of the shooters and that as a result, Mr. Benson knew that he would be arrested and charged with a crime.

Sergeant Wilkie also showed Mr. Payne photographic arrays, but Mr. Payne was unable to identify any of the shooters from the arrays. Sergeant Wilkie also attempted to show photographic arrays to Mr. Roy McKinley, who refused to cooperate.

Dr. Erica Curry, the medical examiner who performed the victim's autopsy, was accepted by the trial court as an expert in forensic pathology. She testified that the victim sustained multiple graze gunshot wounds and four gunshot wounds to his back, one of which exited his chest. The victim also sustained gunshot wounds to his left forearm, left leg, and left thigh. Dr. Curry believed that the gunshot wounds were caused by a large caliber handgun. She concluded that the cause of the victim's death was multiple gunshot wounds and that the manner of his death was homicide. She recovered projectiles or bullets from the gunshot wounds to the victim's back, a bullet fragment from the left side of his back, a projectile from his left anterior thigh, a bullet fragment from his left leg, and bullet fragments from the abrasions on both side of the victim's back.

On cross-examination, Dr. Curry testified that the victim had a total of six entry wounds, two exit wounds, and five graze wounds. He also had a fresh abrasion on the knuckle area on his left hand. Dr. Curry stated that the gunshot wound whereby the projectile traveled through the victim's aorta and trachea and exited his cheek caused the victim's death.

Dr. Curry acknowledged that she did not have any training in weapons or ballistics and that her testimony regarding the type of weapon that may have been used was based on her experience in examining gunshot wounds and projectiles that she retrieved from bodies. She determined that the projectile was a large caliber bullet based on the circumference of the bullet. She acknowledged that she could not determine the exact caliber of the projectiles or whether the projectiles recovered were fired from the same handgun. She also acknowledged that the closer that the shooter is when shooting, the larger the gunshot wound. Dr. Curry was unable to exclude the possibility that the victim was shot with a different caliber firearm or an automatic rifle.

Special Agent Eric Warren, who was assigned to the Firearm Identification Unit of the Tennessee Bureau of Investigation, was accepted by the trial court as an expert in the field of firearm forensics. He received six 7.62 x. 39 millimeter rifle cartridge casings,

two nine millimeter cartridge casings, one forty caliber cartridge casing, and one live 7.62 x 39 millimeter bullet. He concluded that the six 7.62 x 39 millimeter cartridge casings were fired with the same firearm and that the live round was of the same type and from the same manufacturer as some of the other fired cartridge casings that he received. He also concluded that the two nine millimeter cartridge casings had the same mechanical fingerprint and had been fired from the same firearm.

Special Agent Warren testified that a 7.62 x 39 millimeter bullet is typically a rifle round and that the most common firearm used to shoot this caliber bullet is an AK47 or an SKS rifle. The largest caliber of the three types of bullets was the forty caliber bullet, and the 7.62 x 39 millimeter was the smallest caliber of the three bullets. He said a nine millimeter firearm could not fire a forty caliber bullet.

Special Agent Warren received from the medical examiner's office one bullet that was almost completely intact but damaged, two large bullet fragments, and four small bullet fragments. He determined that the bullet was a nine millimeter bullet and that the two large bullet fragments were consistent with nine millimeter bullets. He was not able to determine the caliber of the four small bullet fragments.

**The Defendants' Proof**

Mr. Flynn did not present any proof at trial. Mr. Benson presented the testimony of his mother, Nina Benson, who recalled that Mr. Benson was shot in the leg in 2012. Upon his release from the hospital, he was prescribed Naproxen, Flexural, and Percocet. Mr. Benson stayed at Ms. Benson's home to recover. Ms. Benson said that Mr. Benson was in pain as a result of the injury, that his wound became infected, and that he was required to take his medication twice a day. Ms. Benson stated that when Mr. Benson took his medication, he became drowsy and weak.

Ms. Benson testified that on the evening of Mr. Benson's arrest, he took his medication around 6:30 or 7:00 p.m. after he had eaten dinner. She said Mr. Benson also smoked marijuana around the same time that he took his medication. When the police arrived, Mr. Benson was lying on the floor, and Ms. Benson was preparing the couch that folded out into a bed so that he could go to sleep. Ms. Benson stated that she asked the officers if she could accompany Mr. Benson because she knew that he had taken his medication but that the officers refused her request. She also stated that the officers told her that they planned to ask Mr. Benson a few questions and then bring him home but that Mr. Benson never returned.

- 14 -

Ms. Benson testified that Mr. Benson had a ninth grade education, did not perform well in school, and attended resource classes. She said Mr. Benson's statement to the police did not reflect the language that he generally used.

On cross-examination, Ms. Benson acknowledged that Mr. Benson lied to the police officers if he told them that he had not taken any drugs or alcohol prior to questioning by the officers. On redirect examination, Ms. Benson testified that the portion of Mr. Benson's statement reflecting that he had a twelfth-grade education was also inaccurate.

Ms. Rickeyeccea Hines testified that in August 2012, she was living with Ms. Benson and was responsible for administering Mr. Benson's medication twice a day when he returned from the hospital after sustaining a gunshot wound to his leg. The wound became infected. She recalled that Mr. Benson was prescribed Flexural, Naproxen, and another type of medication. She stated that after Mr. Benson took his medication, he would become drowsy and slurred his speech.

Ms. Hines testified that she administered Mr. Benson's medication to him on the evening before the police officers arrived and that Mr. Benson smoked marijuana shortly before the police arrived. Ms. Hines and Ms. Benson gave Mr. Benson a bath, and he was lying on the living room floor while Ms. Hines and Ms. Benson pulled out the couch into a bed when the police arrived. Ms. Hines stated that the officers told them that they planned to question Mr. Benson and return him and that Ms. Benson could not accompany Mr. Benson.

On cross-examination, Ms. Hines testified that she administered the medication to Mr. Benson around 7:00 or 7:30 p.m. and that Mr. Benson then smoked one "blunt" of marijuana. She said that while Mr. Benson was able to communicate with her before she administered the medication, he was no longer able to communicate once he took the medication. The police arrived at approximately 9:00 p.m. Ms. Hines acknowledged that she did not know Mr. Benson's condition when his statement was completed at 12:10 a.m.

Mr. Benson also presented his medical records relating to the gunshot wound to his lower left leg. The medical records reflected that Mr. Benson was prescribed Percocet, Cephalexin, and Naproxen.

The Defendants were charged with first degree premeditated murder. The jury convicted the Defendants of second degree murder. Following a sentencing hearing, the trial court sentenced Mr. Benson to twenty-four years in confinement at 100% and Mr. Flynn to twenty-five years in confinement at 100%.

# ANALYSIS

On appeal, the Defendants argue, either individually or collectively, that (1) the trial court erred in denying their motions to sever; (2) a witness's identification of Mr. Flynn in a photographic array was unreliable and should have been suppressed; (3) the evidence was insufficient to support the convictions; (4) the trial court erred in denying Mr. Flynn's motion to dismiss due to spoliation of evidence; (5) the jury failed to follow the trial court's instructions and improperly compromised on a verdict of second degree murder; and (6) the sentences are excessive.

## I.     SEVERANCE

The Defendants contend that the trial court erred in denying their motions to sever their trials. Mr. Flynn argues that because the Defendants were tried jointly, he was unable to call Mr. Benson as a witness at trial and that Mr. Benson's testimony was essential to his defense. Mr. Flynn also argues that the admission of Mr. Benson's redacted statement at trial resulted in unfair prejudice. Finally, Mr. Flynn argues that severance of the trials was required because he and Mr. Benson had antagonistic defenses. Mr. Benson asserts that as a result of the joint trial, he was effectively denied his right to present evidence necessary for his defense.

## A.  Factual and Procedural Background

Prior to trial, Mr. Flynn filed a motion to sever his trial from Mr. Benson's trial based upon the multiple statements that Mr. Benson gave during the course of the case. On August 28, 2012, Mr. Benson spoke to Sergeant Anthony Lee about his gunshot wound and stated that he was the victim of a drive-by shooting on First Street near Kansas Street, that Mr. Flynn and two women were with him at the time of the shooting, and that Mr. Benson was unable to see who shot him. Mr. Benson gave a second statement to Sergeant Lee during the morning of August 30 and stated that he was the victim of a drive-by shooting on August 27 in the area of First Street and Kansas Street, that Mr. Flynn and two women named "Kiki" and "Nesha" were also present, and that Mr. Flynn then drove Mr. Benson to the hospital. Later on August 30, Mr. Benson gave a statement to Sergeant Oliver in which he stated that Mr. Flynn shot both him and the victim. Mr. Benson admitted that he was present at Hillview Apartments when the victim was shot but maintained that he did not shoot the victim. Mr. Benson also identified Mr. Flynn in a photographic array as the shooter.

Mr. Flynn submitted that on February 26, 2013, Mr. Benson gave a statement to an investigator hired by Mr. Flynn retracting his statement to the police in which he implicated Mr. Flynn in the victim's death. Mr. Benson maintained that he was taking prescription medication when he gave the statement to the police and that he did not

recall providing the statement or what he said in the statement. Mr. Benson denied knowing the victim or ever going to the Hillview Apartments and said he had no knowledge of Mr. Flynn ever going to the apartment complex. Mr. Benson maintained that his initial statement that he was shot during a drive-by shooting was accurate. He stated that when he identified Mr. Flynn in a photographic array, he identified Mr. Flynn as the person who was with him when he was shot. Mr. Benson maintained that the police officers should not have asked him to give a statement due to his condition at the time and that he hoped to have the statement suppressed.

In his motion to sever the trials, Mr. Flynn argued that if the Defendants were tried jointly, he would not be able to call Mr. Benson to testify regarding his statements originally provided to the police, the circumstances surrounding his third statement to the police, and the retraction of the third statement through a statement taken by Mr. Flynn's investigator. Mr. Flynn further argued that any redaction of Mr. Benson's third statement for admission at trial would unfairly prejudice Mr. Flynn because the redacted statement would appear to make Mr. Benson a witness to the shooting and not a participant and would allow the jury to infer that Mr. Flynn was involved because Mr. Flynn subsequently drove Mr. Benson to the hospital for treatment of the gunshot wound. Mr. Flynn argued that he would not be able to attack the credibility of that statement without cross-examining Mr. Benson regarding his other inconsistent statements. Mr. Flynn further maintained that admitting part of Mr. Benson's statement without allowing Mr. Flynn the opportunity to cross-examine and impeach Mr. Benson would violate both the due process clause and confrontation clause of the United States and Tennessee Constitutions. Counsel for Mr. Flynn stated that counsel for Mr. Benson informed him that if Mr. Benson was called to testify at a separate trial of Mr. Flynn, Mr. Benson would assert his privilege to not testify.

The State filed a response in opposition and attached both Mr. Benson's original statement given to Sergeants Oliver and Wilkie and a redacted statement, which the State maintained complied with the mandates of *Bruton v. United States*, 391 U.S. 123 (1968). The original statement reflects that Mr. Benson denied any responsibility for the victim's death and maintained that Mr. Flynn, whom Mr. Benson called "T-Bo," shot the victim. Mr. Benson stated that he saw the shooting occur and that he was by himself. He also stated that he saw Mr. Flynn and Mr. Flynn's friends with weapons, that Mr. Flynn had a handgun, that he was shot by Mr. Flynn's handgun, and that "[a]ll [he] saw w[ere] handguns." Mr. Benson did not know anyone who was with Mr. Flynn. Mr. Benson said that, while he had a gun, he did not fire it and that Mr. Flynn took the gun after the shooting occurred. When asked whether any vehicles were involved in the shooting, Mr. Benson replied "T-Bo's burgundy Maxima." Mr. Benson said that when the shooting occurred, it was dark outside and that the street lights around the apartment complex were lit.

Mr. Benson said Mr. Flynn shot the victim as a result of an altercation between Mr. Flynn and the victim on the Saturday before the shooting at Studio Blue, a night club, after the victim cheated in a game of dice. After they exchanged words, the victim told Mr. Flynn "to come get up with him in his apartments, the Hillviews." When asked to explain what occurred before, during, and after the shooting, Mr. Benson replied:

Me and T-Bo was in his car over on Farrington and T-Bo said he was going to drop me off at Hillview to see if dude was over there and for me to let him know when I see him. The plan was so that they could fight him because of the dice game. We decided to carry guns for protection in case it got out of hand. This was earlier on Monday; it was just starting to get dark. So it got dark and T-Bo dropped me off. It was just me and him when he dropped me off. I walked through the apartments and sat on the stairs.

About thirty minutes I saw the dude, wearing a black shirt and some khaki pants. I called T-Bo and told him that I saw the dude and he said "here we come." Then when they had came T-Bo was in the front and the other dudes were in the back so when they were walking up I was getting up from the steps to get close and that's when I saw them pull the guns out and they just started shooting and then a bullet hit me in the left leg. I was yelling at T-Bo, "you shot me bra, you shot me." I started running but I couldn't run while my gun was in my sock so I took it out to run better and T-Bo helped me get to the car.

He put me in the car and we pulled off and I saw two dudes just keep running. We got in the car and he dropped the other dudes in the car, who helped him do the shooting really, around Norris. Then we rolled down Elvis Presley and ran out of gas at Winchester and Elvis Presley. T-Bo went and got some gas for the car from the BP or the Citgo and after he put gas in the car we went to Methodist Hospital.

T-Bo pulled up to the ambulance part and started honking the horn and then the hospital people came out and put me in a wheelchair. They started doctoring on me. The police showed up and they asked me what happened and I told them that I got shot on First and Kansas street. Later on my mother cam[e] and so did T-Bo. T-Bo was wearing a different shirt when he came back to see me than he had on at the shooting. About two the next morning I went home.

- 18 -

Mr. Benson denied that he and Mr. Flynn discussed the shooting or the story that Mr. Benson would tell the police to explain the gunshot wound. Mr. Benson explained that he told the police officers that he was shot at First Street and Kansas Street because he did not want Mr. Flynn to go to jail. Mr. Benson said Mr. Flynn told him that "some girl" informed him of what clothes the victim would be wearing that night. Mr. Benson stated that the "fat dude" who was driving Mr. Flynn's car was the closest to the victim when the shooting began. Mr. Benson saw Mr. Flynn shoot first and maintained that Mr. Flynn shot "a couple of times." Mr. Benson identified Mr. Flynn in a photographic array as the person who shot the victim and him.

The State redacted Mr. Benson's statement to reflect that while Mr. Benson denied responsibility for the shooting, he stated that "my friend" was the responsible party. According to the redacted statement, Mr. Benson was shot by a handgun. While he had a gun, he denied shooting it and said "[t]hey" took the gun following the shooting. He stated that a burgundy Maxima was involved in the shooting. When asked to state why the victim was shot, Mr. Benson replied, "There was an altercation playing dice on the Saturday before at Studio Blue. [The victim] was cheating." The redacted statement provided that when asked to describe what occurred, Mr. Benson stated:

> I was going to get dropped off a Hillview to see if dude was over there. The plan was so that they could fight him because of the dice game. We decided to carry guns for protection in case it got out of hand. This was earlier on Monday; it was just starting to get dark. So it got dark and I was dropped off. I walked through the apartments and sat on the stairs. About thirty minutes I saw the dude, wearing a black shirt and some khaki pants. I called[,] said that I saw the dude. Then when they came, so when they were walking up I was getting up from the steps to get close and that's when I saw them pull the guns out and they just started shooting and then a bullet hit me in the leg. I was yelling, "you shot me bra, you shot me." I starting running but I couldn't run while my gun in my sock so I took it out to run better. We pulled off and I saw two dudes just keep running. We got in the car then we rolled down Elvis Presley and ran out of gas at Winchester and Elvis Presley. We put gas in the car we went to Methodist Hospital. The hospital people came out and put me in a wheelchair. They started doctoring on me. The police showed up and they asked me what happened and I told them that I got shot on First and Kansas Street. Later on my mother came. About two the next morning I went home.

According to the redacted statement, Mr. Benson stated that he told the police that he was shot at First Street and Kansas Street because "I didn't want my friend to go to jail and I

knew that he had shot me." He stated that he knew what the victim would be wearing because "I was told."

During a pretrial hearing on the motion to sever, counsel for Mr. Flynn stated that Mr. Flynn's prior counsel instructed the investigator to interview Mr. Benson during a time in which Mr. Benson was not represented by counsel, and the retraction of his statement occurred during this interview. Counsel for Mr. Benson confirmed that at the time of the investigator's interview, Mr. Benson had been indicted, was attempting to retain an attorney, and "was kind of in limbo as far as having an attorney."

Mr. Flynn offered argument that was similar to his argument in his motion to sever. Mr. Flynn also argued that the statement as redacted by the State did not remove the "connecting evidence" and continued to implicate him when considered with other evidence that the State intended to present. The State maintained that Mr. Benson's statement was properly redacted. The State further maintained that Mr. Benson's statement to the investigator was inadmissible hearsay and only could be used as impeachment evidence if Mr. Benson testified at trial.

Mr. Benson also objected to the proposed redacted statement and argued that the Defendants were so intertwined in the statement that it could not be redacted in such a way as to comply with the rule of completeness and the principles of fundamental fairness. Following the hearing, Mr. Benson filed a motion to sever the trials in which he argued that the State's proposed redaction altered the substance of the statement and removed exculpatory information.

The trial court filed an order denying the Defendants' motions to sever the trials. However, the trial court concluded that "all connecting references" to Mr. Flynn must be removed from Mr. Benson's statement. The trial court found that the State improperly substituted Mr. Flynn with "my friend" in the statement and that any references to "my friend" should be removed. The trial court also required that the term "we" be redacted from the narrative. The trial court found that the statement that "we went to Methodist Hospital" was prejudicial because the State would likely present a video recording at trial showing Mr. Flynn transporting Mr. Benson to the hospital. The trial court also found that Mr. Benson's reference to a burgundy Maxima must be removed because Mr. Flynn owned or had access to this type of vehicle and the jury could link Mr. Flynn to the person referenced in Mr. Benson's statement.

The trial court rejected Mr. Benson's argument that the redacted statement was so altered in its substance that severance was required. The trial court found that Mr. Benson's statement reflected that he denied responsibility for the shooting and that his answers to the remaining questions could be seen as those of an observer of the events

and not a participant. The trial court also found that none of the redacted portions of the statement included exculpatory information and could not "hurt" Mr. Benson's defense. The trial court concluded that Mr. Benson's statement to Mr. Flynn's investigator was self-serving and was not admissible at trial under the Tennessee Rules of Evidence.

The trial court attached to its order Mr. Benson's statement, which the trial court further redacted. In the statement, Mr. Benson denied that he was responsible for the victim's death and said that he knew the responsible party. He stated that he was by himself when the shooting occurred, that he did not know any of the witnesses to the shooting, and that he did not know anyone who was with the shooter at the time of the shooting. He also stated that he saw handguns and that he was shot with a handgun. Mr. Benson said that he had a small brown .22 caliber gun when the shooting occurred but denied shooting his gun. He also said that following the shooting, "[t]hey" took his gun. Mr. Benson stated that the victim was shot as the result of an altercation at Studio Blue on the Saturday before the shooting when the victim cheated in a dice game. When asked to describe what occurred, the statement reflected that Mr. Benson replied:

> I was going to get dropped of[f] at Hillview to see if dude was over there. The plan was so that they could fight him because of the dice game. Decided to carry guns for protection in case it got out of hand. This was earlier on Monday; it was just starting to get dark. So it got dark and I was dropped off. I walked through the apartments and sat on the stairs. About thirty minutes I had saw the dude, wearing a black shirt and some khaki pants. I called[,] said that I saw the dude. Then when they came, so when they were walking up I was getting up from the steps to get close and that's when I saw them pull the guns out and they just started shooting and then a bullet hit me in the leg. I was yelling, "you shot me bra, you shot me." I started running but I couldn't run while my gun was in my sock so I took it out to run better. Pulled off and I saw two dudes just keep running. Got in the car then rolled down Elvis Presley and ran out of gas at Winchester and Elvis Presley. Put gas in the car went to Methodist Hospital. The hospital people came out and put me in a wheelchair. They started doctoring me. The police showed up and they asked me what happened and I told them that I got shot at First and Kansas Street. Later on my mother came. About two the next morning I went home.

Mr. Benson said he knew what the victim would be wearing that night because he "was told."

Mr. Flynn filed a motion to reconsider in which he requested that the trial court also redact Mr. Benson's reference in another part of his statement to the "fat dude that

was driving the car" as the person who was the closest to the victim when the shooting began and his statements regarding his trip to the hospital following the shooting since the jury could connect Mr. Benson's statement to Mr. Flynn based upon the video evidence from the hospital that the State would present at trial. The trial court entered an order granting Mr. Flynn's motion. While several pages of the order are not included in the appellate record, it appears that Mr. Flynn's motion was granted as it related to Mr. Benson's statements regarding his trip to the hospital as those references were not included in Mr. Benson's statement that was introduced at trial.

At trial, Mr. Benson's counsel sought to question Sergeant Taylor on cross-examination about his investigation of the shooting that resulted in Mr. Benson's gunshot wound. During a hearing outside the presence of the jury, Sergeant Taylor testified that he spoke to both Defendants at the hospital and that his investigation led him to the area of "Farrington and Outer Parkway" where he and crime scene officers located two spent shell casings. Sergeant Taylor clarified that Mr. Flynn advised him of the location, rode with him to the location, and directed him to the area. Sergeant Taylor stated that Mr. Benson never advised him of the location.

The State objected to Sergeant Taylor's testimony, arguing that the evidence was not relevant, was self-serving, and constituted hearsay. Counsel for Mr. Flynn also objected to any reference to Mr. Flynn. Mr. Benson's counsel responded that he was not eliciting hearsay evidence from Sergeant Taylor because counsel was not asking the officer what the Defendants said but was asking him what he did in response. Mr. Benson again argued that by redacting the portion of his statement whereby he said he initially told officers that he was shot at another location, the trial court removed exculpatory information from his statement. The trial court noted that it was required to consider Mr. Flynn's rights in rendering its decision. The trial court ultimately held that the evidence could only be admitted if Mr. Benson testified at trial.

During cross-examination of Sergeant Wilkie, counsel for Mr. Benson asked the trial court for permission to question Sergeant Wilkie about whether Mr. Benson said he was shot at another location. Counsel argued that the reference to the alternate location was redacted from Mr. Benson's statement due to *Bruton* issues and that he could phrase the question so that Sergeant Wilkie's response would not violate *Bruton*. The trial court stated that based on its prior ruling, it would not be "fair" to either Mr. Flynn or the State to allow the questioning. The trial court found that if Mr. Benson chose to testify, he could then recall Sergeant Wilkie as a witness and present the evidence.

At the conclusion of the State's proof, Mr. Benson again moved for severance of the trials. The trial court denied Mr. Benson's motion. At the conclusion of the proof,

the trial court instructed the jury that any evidence limited to a particular defendant should not be considered as to the other defendant.

## B.  Analysis

"The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court," and this court will not disturb the trial court's ruling absent a clear abuse of discretion.  *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008) (citing *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969) *vacated on other grounds by Hunter v. Tennessee*, 403 U.S. 711, 712 (1971); *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)).  The test to be applied in determining whether the trial court abused its discretion is whether the defendant was "'clearly prejudiced'" in his defense by being jointly tried with his codefendant.  *Dotson*, 254 S.W.3d at 390 (quoting *Hunter*, 440 S.W.2d at 6); *see State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000).  "The record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became judicial duty' … before an accused is entitled to a reversal of his conviction."  *Burton*, 751 S.W.2d at 447 (quoting *Hunter*, 440 S.W.2d at 6).

Rule 8 of the Tennessee Rules of Criminal Procedure provides that "[a]n indictment, presentment, or information may charge two or more defendants … if each of the defendants is charged with accountability for each offense included…."  Tenn. R. Crim. P. 8(c)(1).  If the defendant bases a motion for severance on a co-defendant's out-of-court statement that "makes reference to the defendant but is not admissible against the defendant," the trial court must determine whether the State intends to offer the co-defendant's statement at trial.  Tenn. R. Crim. P. 14(c)(1).  If the State intends to present the statement at trial, the State must elect:

> (A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;
>
> (B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or
>
> (C) severance of the moving defendant.

*Id.*  The trial court also shall grant severance before trial if the court finds that a severance is "appropriate to promote a fair determination of the guilt or innocence of one or more defendants."  *Id.* at (c)(2)(A).  During trial and with the consent of the defendants to be severed, the trial court shall grant a severance upon finding that a severance is "necessary

- 23 -

to achieve a fair determination of the guilt of innocence of one or more defendants." *Id.* at (c)(2)(B).

In *Bruton v. United States*, the United States Supreme Court held that admission of a statement of a non-testifying co-defendant which expressly incriminates the complaining defendant violates the complaining defendant's constitutional right of confrontation. 391 U.S. 123, 126 (1968); *see* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "[T]he rule in *Bruton* does not apply to confessions which do not implicate the non-confessing defendant, nor does it apply to confessions from which all references to the moving defendant have been effectively deleted, provided that, as deleted, the confession will not prejudice the moving defendant." *Dorsey v. State*, 568 S.W.2d 639, 642 (Tenn. 1978) (citations omitted). Accordingly, Rule 14(c)(1) addresses those situations in which a *Bruton* issue may arise.

The provision of Rule 14(c)(1) can conflict with the completeness rule, which provides that, if the State introduces only a portion of the defendant's statement at trial, the defendant "is normally entitled to prove the whole of what was said in order for the jury to be able to weight the whole statement" unless the confession "involv[es] a non-testifying co-defendant." *Denton v. State*, 945 S.W.2d 793, 801 (Tenn. Crim. App. 1996) (citations omitted). "To hold otherwise would be to render impossible the use of a redacted statement in joint trials involving a *Bruton* situation." *Id.*

### 1. Octavius Flynn

Mr. Flynn contends that because the trial court denied his motion for severance, he was unable to call Mr. Benson as a witness to testify regarding his original statements to the police, the circumstances surrounding Mr. Benson's third statement to the police in which he admitted that he was present when the victim was shot, and Mr. Benson's retraction of this third statement during an interview with Mr. Flynn's investigator. "'It is not an abuse of the trial court's discretion to refuse to sever when the defendant claims that a codefendant would have given exculpatory testimony at a separate trial but the codefendant invoked the [F]ifth [A]mendment at a joint trial.'" *State v. Price*, 46 S.W.3d 785, 805 (Tenn. Crim. App. 2001) (quoting *State v. Ash*, 729 S.W.2d 275, 279 (Tenn. Crim. App. 1986)). Mr. Benson invoked his Fifth Amendment right against self-incrimination and chose not to testify at the joint trial. In Mr. Flynn's motion for severance, his counsel acknowledged that Mr. Benson's counsel informed him that Mr. Benson would likewise invoke his Fifth Amendment rights if called as a witness at a separate trial. Accordingly, the trial court did not abuse its discretion in denying Mr. Flynn's motion for a severance on this basis.

- 24 -

Mr. Flynn argues that Mr. Benson's redacted statement that was admitted into evidence unfairly prejudiced Mr. Flynn because the statement made Mr. Benson appear to be a witness to the crime rather than a participant. In both the redacted and unredacted statements, Mr. Benson denied responsibility for shooting the victim and stated that he believed that others planned to fight the victim as a result of an earlier altercation that arose after the victim cheated during a dice game, that Mr. Benson went to the apartment complex and alerted others to the victim's presence, that others began shooting at the victim, and that Mr. Benson was shot in the leg. The redactions did not alter Mr. Benson's statement in such a way as to lessen his culpability.

Mr. Flynn also argues that Mr. Benson's statement improperly allowed the jury to infer Mr. Flynn was present and involved in the shooting because he subsequently transported Mr. Benson to the hospital. Mr. Benson's redacted statement excluded any information about Mr. Flynn transporting him to the hospital after he was shot. Rather, it appears that Mr. Flynn argues that Mr. Benson's redacted statement incriminated him when linked with other evidence introduced at trial.

*Bruton* is limited to instances where the non-testifying co-defendant "'expressly implicat[ed]' the [complaining] defendant as his accomplice." *Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (quoting *Bruton*, 391 U.S. at 124) (first alteration in *Richardson*). In *Richardson*, the Court declined to extend *Bruton* to a statement, which "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Id.* The Court noted that where a co-defendant's statement expressly implicates a complaining defendant as an accomplice, such as the statement at issue in *Bruton*, there is a great risk that a the jury cannot or will not follow a trial court's instruction to only consider the statement against the co-defendant. *Id.* at 207-08. However, when linkage of other evidence is required to establish that the co-defendant's statement incriminates the complaining defendant, "it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence" as to the complaining defendant and "there does not exist the overwhelming probability of [the jury's] inability to do so." *Id.* at 208. The Court stated that "[i]f limited to facially incriminating confessions, *Bruton* can be complied with by redaction." *Id.* at 208-09. The Court further stated that "[i]f extended to confessions incriminating by connection, not only is that not possible, but it is not even possible to predict the admissibility of a confession in advance of trial." *Id.* at 209. Rather, the trial court would be required to assess at the end of trial "whether, in light of all of the evidence, a nontestifying codefendant's confession has been so 'powerfully incriminating' that a new, separate trial is required for the defendant." *Id.* The Court noted that such a practice could lead to manipulation by the defendant and would result in numerous mistrials and appeals. *Id.*

Mr. Benson's redacted statement that was introduced at trial did not incriminate Mr. Flynn on its face. Because the redacted statement incriminated Mr. Flynn only when linked with other evidence introduced at trial, it fell outside the scope of the *Bruton* rule.

Although the trial court gave a generic jury instruction that any evidence limited to one defendant should not be considered against the other defendant, the trial court did not specifically instruct the jury that Mr. Benson's statement could only be considered against Mr. Benson and not Mr. Flynn. However, we conclude that the failure to give a specific limiting instruction was harmless. *See State v. Martha Ann Freeman*, No. M2006-02751-CCA-R3-CD, 2008 WL 833936, at *23 (Tenn. Crim. App. Mar. 28, 2008) (holding that although the trial court failed to provide a limiting instruction where the co-defendant's statement only implicated the defendant with "evidentiary linkage," the failure to give the limiting instruction was harmless). Mr. Flynn failed to request a limiting instruction. *See id.*; *see also United States v. Sherlin*, 67 F.3d 1208, 1216 (6th Cir. 1995) ("We note that the record in this case does not indicate that the district court gave a limiting instruction to the jury regarding the evidentiary scope of [the co-defendant's] statement. We do not, however, find the lack of instruction problematic in this case because [the defendant] did not request such an instruction."). In light of Mr. Flynn's failure to request an instruction and the evidence presented at trial establishing Mr. Flynn's identity as the shooter and supporting his conviction for second degree murder, we conclude that the trial court's failure to provide the specific instruction was harmless.

Finally, Mr. Flynn maintains that the trial court erred in denying his motion to sever the trials because he and Mr. Benson had antagonistic defenses and that more evidence was presented to support Mr. Benson's participation in the crime. Severance is not required due to the mere fact that there may be more damaging proof against one defendant, as opposed to the other. *State v. Rosalind Marie Johnson and Donna Yvette McCoy*, No. E1999-02468-CCA-R3-CD, 2000 WL 1278158, at *4 (Tenn. Crim. App. Sept. 11, 2000) (citing *State v. Meeks*, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993)). "'[T]he speculative risk of a spill-over effect'" does not justify a conclusion that a joint trial amounts to an abuse of discretion. *Id.* (quoting *Meeks*, 867 S.W.2d at 369). Furthermore,

> [w]hile mutually antagonistic defenses may mandate severance in some circumstances, they are not prejudicial per se. Due to the difficulty in establishing prejudice, relatively few convictions have been reversed for failure to sever on these grounds. Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. The defendant must go further and

- 26 -

establish that a joint trial will result in compelling prejudice, against which the trial court cannot protect, so that a fair trial cannot be had.

*State v. Ensley*, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996) (internal citations and quotations omitted).

The Defendants did not present antagonistic defenses at trial. Rather, each Defendant maintained that he was not present when the victim was shot and challenged the credibility of those witnesses who identified the Defendants as the shooters. Mr. Benson also challenged the reliability of his statement to the police by presenting witnesses who testified that he took prescription drugs as a result of his gunshot wound and smoked marijuana before officers arrived and transported him to the homicide office for questioning. While Mr. Flynn maintains that Mr. Benson's statement would not have been admissible if Mr. Flynn had a separate trial, this is true in almost every case involving multiple defendants where a defendant has made a statement implicating a co-defendant. Furthermore, Mr. Benson's statement was heavily redacted and did not incriminate Mr. Flynn on its face. Mr. Flynn failed to establish that a joint trial resulting in "compelling prejudice," against which the trial court could not protect, and that as a result, he did not have a fair trial. *See id.* Accordingly, the trial court did not abuse its discretion in denying Mr. Flynn's motion for severance.

### 2. Derrick Benson

Mr. Benson contends that the trial court erred in denying his motion for severance made prior to and during trial. He maintains that because he was tried jointly with Mr. Flynn, the trial court did not allow him to elicit testimony that he was shot at another location, thus denying him a right to present a defense.

The United States Constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The Tennessee Supreme Court also has recognized that the right to present a defense is "a fundamental element of due process of law." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)).

The right to offer testimony of witnesses, however, is not absolute. *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). "'In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence.'" *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). Our supreme court has recognized that "[r]ules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process" and that "[s]o long as the rules of procedure and

evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Id.* (citations omitted). As a result, a trial court's rulings regarding the admissibility of evidence, generally, do not rise to the level of constitutional error. *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2004). However, "the erroneous exclusion of evidence that thwarts a criminal defendant's right to present a defense is constitutional error." *State v. Rickey Alvis Bell, Jr.*, __ S.W.3d __, 2015 WL 12582638, at *16 (Tenn. 2015) (citing *Rice*, 184 S.W.3d at 673). In determining whether the trial court's erroneous exclusion of evidence violated a defendant's constitutional right to present a defense, this court must consider "whether the excluded proof is critical to the defense; whether it bears sufficient indicia of reliability; and whether the interest supporting exclusion of the proof is substantially important." *Id.* (citing *Rice*, 184 S.W.3d at 673).

The trial court denied the request of Mr. Benson's counsel to question Sergeant Wilkie on cross-examination about whether Mr. Benson stated that he was shot at another location. Sergeant Wilkie conducted the interview of Mr. Benson, which resulted in the written statement whereby Mr. Benson admitted that he was present when the victim was shot. The record does not indicate what Sergeant Wilkie would have said in response to such questioning. We note that Mr. Benson's original written statement reflected that he acknowledged that he initially told police officers that he was shot during a drive-by shooting at another location in order to protect Mr. Flynn. The trial court redacted this portion of the statement based on *Bruton*, and Mr. Benson does not challenge this redaction on appeal. Accordingly, we cannot conclude that the trial court's decision to disallow such questioning during the cross-examination of Sergeant Wilkie violated Mr. Benson's right to present a defense.

Mr. Benson also challenges the trial court's decision to not allow him to elicit testimony from Sergeant Taylor that after speaking to the Defendants at the hospital in response to a complaint of aggravated assault, Mr. Flynn accompanied him to an intersection where Sergeant Taylor and two crime scene officers located two spent shell casings. The trial court denied Mr. Benson's request to cross-examine Sergeant Taylor about the information based, in part, upon its prior rulings related to *Bruton* and its effect on Mr. Flynn. *Bruton*, however, applies to statements of a defendant that incriminate a co-defendant. *See Bruton*, 391 U.S. at 126. The principles in *Bruton* are not implicated in Sergeant Taylor's proposed testimony, in which he related the actions he took after speaking to the Defendants.

The State contends that the evidence was not relevant. Tennessee Rule of Evidence 401 provides that evidence is relevant is it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." At the time that Mr.

Benson sought to question Sergeant Taylor, no evidence had been presented suggesting that Mr. Benson was shot during a drive-by shooting at another location or otherwise connecting the discovery of the spent shell casings to the case. Accordingly, the relevance of Sergeant Taylor's testimony about his discovery of the spent shell casings after speaking to the Defendants had not yet been established.

The trial court held prior to trial that Mr. Benson's first two statements to the police in which he claimed that he was shot during a drive-by shooting at another location and his statement to Mr. Flynn's investigator in which he affirmed these two prior statements were self-serving. Mr. Benson does not challenge this ruling on appeal. As the Tennessee Supreme Court has stated:

> A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness. If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at this trial to show his innocence.

*State v. King*, 694 S.W.2d 941, 945 (Tenn. 1985) (quotations omitted). Generally, a defendant may not introduce self-serving statements without testifying. *See id*. As a result, Sergeant Taylor's testimony was not relevant until Mr. Benson testified at trial or presented other evidence that he was shot at the intersection where Sergeant Taylor recovered the spent shell casings.

The trial court's ruling did not preclude Mr. Benson from presenting a defense that he was shot at a drive-by shooting at another location and not while shooting the victim. A variety of avenues were available to Mr. Benson to present his defense, including his own testimony or the testimony of the two females whom he maintained in this statement were present when the drive-by shooting occurred. *See Flood*, 219 S.W.3d at 318 (relying in part on the fact that the defendant "was not totally foreclosed from presenting the proffered evidence by the Tennessee Rules of Evidence" in determining that the proffered evidence was not critical to the defendant's defense such that the trial court's exclusion of the evidence did not violate the defendant's right to present a defense). The trial court found that if Mr. Benson testified at trial about his claims that he was injured at another location, Mr. Benson could then recall Sergeant Taylor to testify about the discovery of the shell casings. Because Mr. Benson waived his rights and chose not to testify at trial, no evidence was presented to connect Sergeant Taylor's discovery shell casings at another location to Mr. Benson's gunshot wound. Accordingly, Sergeant Taylor's testimony was not critical to Mr. Benson's defense, and the trial court's exclusion of the testimony did not violate Mr. Benson's right to present a defense.

## II. SUPPRESSION OF IDENTIFICATION

Mr. Flynn asserts that the trial court erred in denying his motion to suppress Mr. Tevarius Chambers's identification of him in a photographic array. The State responds that the trial court properly denied Mr. Flynn's motion to suppress. We agree with the State.

### A. Suppression Hearing

During the suppression hearing, Mr. Chambers testified that he was present when the victim was killed and later spoke to the police about the shooting. He stated that an officer came to his home on November 12, 2012, and reviewed an advice of rights form for witnesses viewing photographic arrays. Mr. Chambers then signed the form and identified the shooters in two photographic arrays.

On cross-examination, Mr. Chambers testified that on the night of the shooting, he was with a group of approximately eight people and that the victim was standing to his immediate left. Mr. Chambers could not recall who was standing on the other side of him or on the other side of the victim. He denied that he was under the influence of any alcohol or drugs at the time of the shooting. He said that when the victim was shot, it was "getting toward nighttime." He maintained that it was not as late as 10:30 p.m. or 11:00 p.m. when the shooting occurred and that the lights in the apartment complex allowed him to see someone clearly from a distance.

Mr. Chambers stated that the shooters walked to the apartment complex from the front and through the "cut" located to the left of Mr. Chambers and beside the victim. The shooters initially walked past the group and then returned. One of the shooters stopped behind and to the left of the victim, and the other shooter stopped further up and to the left of the first shooter. During the suppression hearing, defense counsel and Mr. Chambers discussed the distance that the shooters were standing when they began shooting, and they determined that the second shooter was about twenty to twenty-four feet away and that the first shooter was about fifteen feet away. They also determined that the shooters were approximately sixteen feet away when the shooters first walked past the group. Mr. Chambers was unable to recall which of the men whom he identified as the shooters in the photographic arrays was the first shooter and which was the second shooter. Mr. Chambers stated that the shooters did not say anything before they began shooting.

Mr. Chambers recalled that the shooters were wearing blue jeans but could not recall any other clothing that they were wearing. The shooters did not have their faces covered. Mr. Chambers stated that he looked at the shooters when they first walked past

the group for a few seconds but that he was not really paying attention. He did not look at them when they approached the group, while they were shooting, or while they were fleeing. Mr. Chambers had never seen the shooters prior to that night and did not see where the shooters ran following the shooting.

Mr. Chambers testified that he spoke to police officers about the shooting a few days to one week after the shooting when the officers came to his home and that he signed a statement. The officers also showed him at least two photographic arrays. He acknowledged that the arrays presented during the suppression hearing in which he made identifications were dated November 2012. He then stated that he did not view any photographic arrays prior to November 2012 and could not recall whether he spoke to officers prior to November 2012. He later stated that he did not speak to officers on any other occasion prior to viewing the photographic arrays in November 2012. He said the officers came to his house on multiple occasions and that he was not there. Mr. Chambers testified that prior to viewing the photographic arrays in November 2012, his friends told him what they witnessed and that someone had been arrested. He maintained that his friends did not provide him with information about which he did not already know.

Mr. Chambers said he spoke to officers about the shooting on three or four occasions. He spoke to officers while he was in jail in March 2013 and gave a written statement. He also viewed the same photographic arrays that he had previously viewed. Mr. Chambers acknowledged that in photographic array B, he circled the fourth photograph but that he told officers in his statement that he circled the third photograph. He also acknowledged that in photographic array C, he chose the third photograph but that he told officers in his statement that he chose the fourth photograph. He explained that he "probably got it messed up." He denied that the identifications that he wrote down in his statement were the photographs that he actually chose. Mr. Chambers acknowledged that he told officers in his statement that the shooter whom he identified in photographic array B was skinny, was about twenty or twenty-one years old, was wearing a black "do-rag" and long jeans, and was holding a black gun. In his statement, he also described the shooter whom he identified in photographic array C as skinny, approximately twenty years old, and wearing "long jeans." He stated that by the time that he spoke to officers in March 2013, he had discussed the shooting with others and was aware of who had been arrested.

Sergeant Wilkie testified that he went to Mr. Chambers's home on November 12, 2012, and showed him multiple photographic arrays. To Sergeant Wilkie's knowledge, Mr. Chambers had not viewed the arrays prior to November 12. Sergeant Wilkie presented Mr. Chambers with an advice of rights form to witnesses who view photographic arrays. Mr. Chambers read the form, said he did not have any questions,

and signed the form. He made identifications in photographic arrays B and C, circling the photographs and writing on the arrays.

Sergeant Wilkie testified that Lieutenant Mullins created the photographic arrays in August 2012 and saved them on a computer program. Sergeant Wilkie printed the arrays from the computer program before showing them to Mr. Chambers. He showed Mr. Chambers photographic array C, which included a photograph of Mr. Benson. Another officer later showed Mr. Chambers another array that included a different photograph of Mr. Benson.

On cross-examination, Sergeant Wilkie testified that no other officer met with Mr. Chambers prior to November 2012 because no one was able to locate him. Sergeant Wilkie said he did not take a statement from Mr. Chambers because he did not have a laptop and there was not a computer at the home. They discussed Mr. Chambers coming to the Sergeant Wilkie's office to give a formal statement. Sergeant Wilkie asked Mr. Chambers questions and took notes of those responses. Sergeant Wilkie stated that Mr. Chambers made the identifications in the photographic arrays "[a]lmost immediately." Mr. Chambers indicated to him that he had a good opportunity to view the shooters on the evening of the shooting.

Sergeant Wilkie testified that when he visited Mr. Chambers, the Defendants already had been charged with the victim's death. Sergeant Wilkie only took the photographic arrays that included the photographs of the Defendants to show Mr. Chambers. Sergeant Wilkie arrived at Mr. Chambers's home unannounced, and they discussed Mr. Chambers's account before Sergeant Wilkie showed him the photographic arrays.

Lieutenant Anthony Mullins testified that in August 2012, he was asked to create some photographic arrays. He explained that in creating a photographic array, he began with a photograph of the target and searched for those with a similar complexion, facial hair, hair style, facial features, clothing, positioning, and backgrounds. He attempted to create an array of six photographs where no one stood out. In compiling the arrays, he utilized a computer program that recommended photographs of those with features similar to the target.

At the conclusion of the hearing, the trial court issued an order denying Mr. Flynn's motion to suppress Mr. Chambers's identification of him in a photographic array. The trial court noted that no evidence was presented during the suppression hearing to establish that the challenged photographic array was unduly suggestive. The trial court found that Mr. Chambers's identification of the Defendants in the arrays was reliable based on the totality of the circumstances. The trial court noted that although Mr.

- 32 -

Chambers did not make the identifications until several months following the shooting, he "displayed a distinct level of certainty" according to Sergeant Wilkie, who testified that Mr. Chambers identified the Defendants almost immediately and was certain about his identifications. The trial court further noted that although Mr. Chambers admitted that he did not pay much attention to the Defendants who first passed the group, "he did see enough to remember what direction they walked from and how far away they were standing."

## B.  Analysis

A trial court's factual findings made during a motion to suppress are binding on an appellate court unless the evidence preponderates against them. *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003). Determinations of witness credibility and the resolution of conflicts in the evidence are left to the trial court. *State v. Riels*, 216 S.W.3d 737, 753 (Tenn. 2007). An appellate court may consider testimony presented at trial in reviewing the trial court's conclusions in a motion to suppress evidence. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and to all reasonable inferences drawn from the evidence. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). A trial court's conclusions of law are reviewed de novo. *State v. Sawyer*, 156 S.W.3d 531, 533 (Tenn. 2005). Likewise, a trial court's application of law to the facts is reviewed de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

The United States Supreme Court has recognized that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). The risk of an incorrect identification is greater if the eyewitness is shown a lineup where a single photograph "is in some way emphasized." *Id.* at 383. The risk of misidentification also increases "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id.* "When a defendant argues that a lineup is suggestive based on differences between the subjects of the lineup, this court has required that the subjects be 'grossly dissimilar' before it will find that the lineup is impermissibly suggestive." *State v. Albert W. Bentley*, No. M2010-01882-CCA-R3-CD, 2011 WL 6916762, at *5 (Tenn. Crim. App. Dec. 29, 2011) (citing *State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993)).

The United States Supreme Court has established a two-part analysis which the trial court must apply in determining the validity of a pre-trial identification. *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972). First, the trial court must determine whether the identification procedure was unduly suggestive. *Id.* at 198. If the trial court determines that the identification procedure was unduly suggestive, the court must then consider

- 33 -

whether the identification procedure was reliable under the totality of the circumstances. *Id.* at 199. Five factors to be considered in making that determination include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200. If the trial court determines that the identification procedure was not unduly suggestive, the court need not apply the totality of the circumstances test. *See State v. Butler*, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

The appellate record does not include the exhibits entered during the suppression hearing. However, the photographic arrays in which Mr. Chambers identified the Defendants were entered as exhibits at trial. Furthermore, on appeal, Mr. Flynn does not challenge the identification procedure as unduly suggestive. Rather, he maintains that Mr. Chambers's identification of him in the photographic array was unreliable due to the lighting conditions at the time of the shooting, the brief amount of time that Mr. Chambers viewed the shooters, and his admission that he discussed with others who might have committed the shooting before he made the identification. Because the evidence presented at the suppression hearing did not establish that the identification procedure was unduly suggestive, application of the totality of the circumstances would not result in suppression of Mr. Chambers's pretrial identification of Mr. Flynn. *See Butler*, 795 S.W.2d at 686. Rather, under these circumstances, the lighting at the time of the shootings, the amount of time in which Mr. Chambers viewed the shooters, and his discussion of the shooting and the possible perpetrators with others prior to making the identifications are issues related to the weight to be afforded to Mr. Chambers's identification of Mr. Flynn and not to its admissibility. Mr. Flynn is not entitled to relief with regard to this issue.

## III.   SUFFICIENCY

Both of the Defendants challenge the sufficiency of the evidence supporting their convictions for second degree murder. They argue that the evidence was insufficient to establish the mental element of "knowing." Mr. Flynn also argues that the evidence was insufficient to establish his identity as a shooter. The State responds that the evidence is sufficient to establish the Defendants' convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

Second degree murder is defined as a knowing killing of another. T.C.A. § 39-13-210(a)(1). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787.

Mr. Flynn asserts that the evidence is insufficient to establish his identity as a shooter. The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The issue of identity is a question of fact left to the jury as the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Mr. Flynn challenges the admissibility of Mr. Chambers's pretrial identification of him in a photographic array. We have held that the trial court properly denied Mr.

Flynn's motion to suppress the pretrial identification. Mr. Flynn also asserts that Mr. Chambers's identification of him as one of the shooters was unreliable, arguing that the lighting at the apartment complex was limited, that Mr. Chambers viewed the shooters for a brief time, and that he did not make his identifications until months after the shooting and after he had discussed with others who may have committed the shooting. While Mr. Flynn essentially challenges Mr. Chambers's credibility, it is the jury's responsibility, as the trier of fact, to evaluate the credibility of the witnesses and to decide a defendant's guilt, and we will not "reweigh or reevaluate the evidence." *Bland*, 958 S.W.2d at 659.

Mr. Chambers, who was standing next to the victim when the shooting began, identified the Defendants in photographic arrays and testified at trial that the Defendants were the shooters. The State presented evidence at trial that witnesses identified one of the shooters as wearing a black and white striped shirt. While the shooters were fleeing, the second shooter told the first shooter in the striped shirt that the first shooter shot him too. The second shooter was seen limping as he fled. Shortly after the shooting, Mr. Flynn, who was wearing a black and white striped shirt, brought Mr. Benson to a hospital for treatment of a gunshot wound to Mr. Benson's leg. The hospital was located a short distance away from the apartment complex where the victim was shot. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish Mr. Flynn as one of the shooters.

The Defendants maintain that the evidence was insufficient to establish that the murder was knowingly committed as necessary to sustain a conviction for second degree murder. According to the Defendants, the State only presented evidence that the murder was intentional and premeditated to support the original charge of premeditated first degree murder. The Defendants contend that, accordingly, the jury reached a compromise verdict that was not supported by the evidence presented at trial.

The Defendants argue that based upon the evidence presented by the State at trial, the only viable choices that the jury had were either to convict the Defendants of premeditated first degree murder or to acquit them of the charges. The trial court instructed the jury on multiple lesser-included offenses, including second degree murder, and the Defendants do not challenge the trial court's instructing the jury on the lesser-included offenses. Moreover, the jury is not bound by the State's theory of the case. Rather, the jury was free to reject any evidence of intent and premeditation presented by the State and then to consider whether the evidence presented by the State established that the Defendants were guilty of second degree murder beyond a reasonable doubt. *See State v. Richmond*, 90 S.W.3d 648, 660 (Tenn. 2002) ("Because our constitution invests the jury with the power to determine both the 'law and the facts,' the jury is free to reject any evidence offered by the State, no matter how uncontroverted or uncontested a

particular fact or element may appear.") (citing Tenn. Const. art. I, § 19). We, in turn, must determine whether the evidence, when viewed in a light most favorable to the State, is sufficient to support the jury's verdict.

When viewed in a light most favorable to the State, the evidence presented at trial established that the Defendants approached the victim and his friends at an apartment complex, produced guns, fired multiple shots at the victim, and fled the scene. Such evidence is sufficient to establish that the Defendants were aware that their conduct in shooting the victim multiple times was reasonably certain to cause the victim's death. *See* T.C.A. § 39-11-302(b). Accordingly, the evidence is sufficient to establish that the Defendants knowingly killed the victim and, therefore, to sustain a conviction of second degree murder.

## IV.  DENIAL OF MOTION TO DISMISS

Mr. Flynn maintains that the trial court erred in denying his motion to dismiss based on lost or destroyed evidence pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). In his motion to dismiss filed prior to trial, Mr. Flynn alleged that witnesses were shown multiple photographic arrays but were unable to identify anyone in those arrays and that the State failed to preserve those arrays. Mr. Flynn further alleged that the State failed to preserve a witness advice form for each array viewed, which indicated the witness's failure to identify anyone from that particular array.

Mr. Flynn filed the motion to dismiss after the suppression hearing and several days prior to trial. During the discussion of the jury charge at trial, Mr. Flynn's counsel referenced a hearing on the motion to dismiss and the trial court's denial of the motion. However, the appellate record does not include a transcript of the hearing or any order issued by the trial court denying the motion. It is the appellant's duty to provide a full and complete record to this court of the issues he raises on appeal. *See* Tenn. R. App. P. 24(b). "In the absence of a full and complete record revealing the issues that form the bases for the appeal, we must presume the correctness of the trial court's determination." *State v. March*, 293 S.W.3d 576, 591 (Tenn. Crim. App. 2008). Absence the transcript of the hearing and the trial court's findings, we cannot review the trial court's decision and any factual findings related to that decision. Accordingly, this issue is waived.

## V.  COMPROMISE VERDICT

Mr. Flynn maintains that the jury failed to follow the instructions of the trial court, set aside the unanimity requirement, and reached a compromise verdict of second degree murder. At the conclusion of the proof, the trial court instructed the jury on the elements of premeditated first degree murder, as well as various lesser-included offenses. The trial

court also instructed the jury to first consider the first degree murder charge and not to proceed to consider any lesser-included offenses until the jury "first made a unanimous determination that a defendant is not guilty of the immediately-preceding greater offense or [the jury] ha[s] reasonable doubt of a defendant's guilt to that offense."

During deliberations, the jury sent out a note which stated, "We are at a stalemate on two different charges for both defendants, there is no progress being made." In discussing the statement with the parties, the trial court expressed concern "because they're not supposed to go from one charge to another unless they have a unanimous verdict of not guilty or reasonable doubt." Following a discussion with the parties, the trial court brought the jury back in the courtroom during which the jury foreman affirmed that the jurors were not trying to determine between two charges but that they could not agree to whether the Defendants were guilty or not guilty on a particular charge. The trial court agreed to allow the jurors to have a break and then resume deliberations.

Prior to the break, the jury foreman provided the trial court with another question, which stated:

> Per your instructions we are trying to reach a complete agreement on a charge not guilty before moving to a lesser charge. Some want to move to a lesser charge to see if evidence fits before a total agreement on [the] first charge. Are we allowed to evaluate lesser charges before all agreeing not guilty to [the] first charge?

After conferring with the parties, the trial court reaffirmed its prior instruction to the jury. After deliberating further, the jury found the Defendants guilty of second degree murder.

Although Mr. Flynn maintains that the jury "clearly" failed to follow the trial court's instructions regarding unanimity and "cut a deal," he failed to present any evidence to support his claim that the jury's verdicts were not unanimous. As we have held, the evidence is sufficient to support the Defendants' convictions for second degree murder. Moreover, prior to rendering the verdict, the jury sought clarification from the trial court about whether it was permitted to consider the lesser-included offenses prior to a unanimous decision on the greater offense. Accordingly, Mr. Flynn is not entitled to relief regarding this issue. *See State v. Scott W. Grammer*, No. E2005-02604-CCA-R3-CD, 2007 WL 595908, at \*14 (Tenn. Crim. App. Feb. 26, 2007) (holding that the defendant was not entitled to relief on a claim of a compromise verdict because he failed to demonstrate that the jury's verdicts were not unanimous and the evidence was sufficient to support the convictions).

## VI.   SENTENCING

The Defendants each challenge the trial court's imposition of their respective sentences as excessive.  The State responds that the trial court did not abuse its discretion in imposing the within-range sentences.  We agree with the State.

During the sentencing hearing, Kimberly Johnson, the victim's mother, testified that the victim was nineteen years old when he was killed.  She stated that when the victim was killed, he had a three-month-old son and that the victim's girlfriend was pregnant.  At the time of the sentencing hearing, the victim's children were three years old and two years old.  Ms. Johnson requested that the trial court impose the maximum sentence for each of the Defendants.

With regard to Mr. Benson, the trial court found that that he was a Range I standard offender and applied three enhancement factors: (1) Mr. Benson had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (2) he possessed or employed a firearm during the commission of the offense; and (3) he had no hesitation about committing a crime when the risk to human life was high.  *See* T.C.A. § 40-35-114(1), (9), (10) (2010).  The trial court noted that according to Mr. Benson's presentence report, he had a number of charges that were later dismissed.  However, he was convicted of driving without a license in May 2012 and admitted to past use of marijuana.  Nevertheless, the trial court placed "very little weight" on the prior criminal convictions or behavior enhancement factor.  In applying the high risk to human life enhancement factor, the trial court noted that Mr. Benson decided to accompany Mr. Flynn to exact revenge on the victim, that there were seven or eight men standing around when the Defendants began shooting, and that it was "amazing" that no one else was injured.  In considering mitigation factors, the trial court gave Mr. Benson "some credit" for assisting authorities in locating Mr. Flynn.  The trial court also noted evidence of intellectual disability by Mr. Benson but gave it "little weight."   The trial court sentenced Mr. Benson to twenty-four years of incarceration.

The trial court found that Mr. Flynn was a Range I standard offense and applied the same three enhancement factors that it had applied to Mr. Benson.  With regard to Mr. Flynn's prior history of criminal convictions or behavior, the trial court noted that Mr. Flynn had a prior felony drug arrest that was reduced to a misdemeanor drug conviction.  However, the trial court gave the enhancement factor little weight.  The trial court applied no mitigation factors.  The trial court sentenced Mr. Flynn to twenty-five years of incarceration.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court is "to be guided by-but not bound by-any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing as provided by statute." *Id*. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(4), (5).

As Range I standard offenders convicted of second degree murder, a Class A felony, the Defendants were subject to a sentence of fifteen to twenty-five years. *See* T.C.A. §§ 39-13-210(c); 40-35-112(a)(1). Mr. Flynn does not challenge the trial court's application of the enhancement factors or its failure to apply any mitigating factors. Rather, Mr. Flynn contends that the trial court erred in weighing the enhancement factors. However, under *Bise*, "mere disagreement with the trial court's weighing of the properly

assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d at 706. While Mr. Benson maintains on appeal that the trial court erred in refusing to apply mitigating factors, Mr. Benson does not identify those mitigating factors that the trial court should have applied.

The trial court imposed within-range sentences with Mr. Flynn receiving the maximum sentence. In doing so, the trial court considered the principles of sentencing, the nature and circumstances of the offense, and the applicable enhancing and mitigating factors. Accordingly, the trial court did not abuse its discretion in sentencing Mr. Flynn to the maximum twenty-five-year sentence and Mr. Benson to twenty-four years.

## CONCLUSION

Based upon our review of the record and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE